**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank G. PRANTIL,**
**Defendant-Appellant.**

**No. 84–5024.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 1984.

Decided March 29, 1985.

Charles F. Gorder, Jr., Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Eugene G. Iredale, San Diego, Cal., for defendant-appellant.

Before FERGUSON and NELSON, Circuit Judges, and JAMESON,* District Judge.

FERGUSON, Circuit Judge:

The defendant, a criminal defense attorney, appeals his conviction on eight out of eleven counts alleged in an indictment for the offenses of perjury, 18 U.S.C. § 1623; false statements, 18 U.S.C. § 1001; and being accessory after the fact, 18 U.S.C. § 3. All of the defendant's convictions are predicated on actions he took while representing a criminal defendant, Betty Powell, in a separate criminal prosecution. After a seven-day trial the jury found the defendant not guilty on two counts of harboring a fugitive and perjury. The district court had previously dismissed the misprision of a felony count before the trial began. On appeal, the defendant raises a host of issues which, for the most part, we need not address. Three of the defendant's challenges, however, require reversal of the defendant's convictions for the reasons explained herein.

## I. FACTUAL BACKGROUND

The defendant was retained by Ronald Powell to represent his wife, Betty Lou Powell, and her son in a federal criminal prosecution on various drug-related charges.[1] Mr. Powell had been a previous client of the defendant in unrelated criminal proceedings. After Mrs. Powell and her son were arrested at the Powell residence on April 23, 1982 in connection with the narcotics charges, Mr. Powell, who was also named in the felony arrest warrant, remained a fugitive until his apprehension on August 10, 1982. On the day of his wife's arrest, Mr. Powell telephoned the defendant, Frank Prantil, and retained his services for the criminal proceedings against his immediate family. Throughout Mr. Powell's fugitive status, the defendant periodically telephoned Mr. Powell and met him on at least two occasions.

During their first meeting after the incarceration of Mrs. Powell, Mr. Powell presented the defendant with a partial payment of the retainer agreement and directed the defendant to the whereabouts of other sources of cash in various bank accounts and at the Powell residence. Mrs. Powell, unable to make a $750,000 bond, remained incarcerated until the completion of her criminal trial. She gave the defendant the power of attorney to collect the funds from the various bank accounts. The defendant also retrieved a substantial sum of money from a floor safe at the Powell residence that had been overlooked at the time of the Powell family arrest. Although questions over the capacity in

---

* Hon. William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

1. See United States v. Powell, 708 F.2d 455 (9th Cir.1983), rev'd in part, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Betty Powell was convicted on four counts of a fifteen-count indictment which had alleged that she conspired with her husband and son to distribute cocaine. She was acquitted on all substantive conspiracy counts. Three of her four convictions, those alleging the use of a telephone to facilitate drug offenses, were subsequently reversed on appeal, United States v. Powell, 708 F.2d 455 (9th Cir. 1983), but then reinstated by the Supreme Court, United States v. Powell, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

which Mr. Prantil retained custody of these monies (as attorney fees or in bailment for Mrs. Powell) occupied a substantial portion of the defendant's trial, we need not parse the evidence on this subject here. Pursuant to the retainer agreement negotiated by Mr. Powell, the defendant represented Mrs. Powell for the duration of her criminal trial. The case was prosecuted by Assistant United States Attorney Charles Gorder.

Mr. Prantil succeeded in obtaining an acquittal on all but four of the fifteen criminal counts leveled against his client Mrs. Powell. During the course of his representation of Mrs. Powell, the defendant also sent his sister-in-law, Malvina Schmidt, to meet the fugitive Ronald Powell for reasons not relevant here. Within the same time frame, the defendant, on several occasions, acted as the conduit for negotiations between the fugitive Ronald Powell and Assistant U.S. Attorney Gorder for Mr. Powell's surrender. During the period when Mr. Powell was a fugitive, the defendant was summoned before a grand jury and questioned by Mr. Gorder concerning his contacts and relationship with Mr. Powell. Three of the defendant's five perjury convictions rest on responses he made to Mr. Gorder's grand jury examination. The remaining two perjury charges and the two false statement counts stem from the events surrounding the defendant's efforts to obtain Mrs. Powell's release on bond pending the appeal from her criminal conviction. For purposes of this appeal, however, we need only discuss the evidence presented on one perjury count.

One of the defendant's perjury convictions rests on grand jury testimony the defendant gave under questioning by Mr. Gorder regarding a trip to Omaha, Nebraska. In his testimony the defendant stated that he was picked up by a blonde woman at the airport in Omaha, Nebraska and this woman took him to meet the fugitive Mr. Powell. The defendant further testified that he did not know the identity of this woman. At trial the government contended that the defendant committed perjury when he denied knowing the name of the woman at the Omaha airport.

Under the government's theory, the defendant falsely denied knowing the identity of this blonde woman in order to protect the woman from the grand jury's investigation. The government unsuccessfully sought to prove that this blonde woman at the Omaha airport was Malvina Schmidt, the defendant's sister-in-law. The evidence at trial revealed that although the defendant had been met at a different airport by a blonde woman on a different occasion, no one picked up the defendant at the Omaha airport. The evidence did demonstrate that the defendant eventually met his sister-in-law at a restaurant in the Omaha area. Accordingly, on appeal the government has shifted its perjury allegation by recasting the defendant's denial of knowledge about the name of the blonde woman who met him at the airport into a denial of "knowing who was with [Mr.] Powell in the Omaha area." In response, the defendant claims his conviction should be reversed because the identity of the woman whom he incorrectly recalled to have met at the Omaha airport is immaterial to any matters then before the grand jury and thus not perjurious.

## II. ISSUES ON APPEAL

The defendant has raised several challenges to his convictions on appeal. We reach only three of his challenges. The defendant's first allegation of error involves the refusal of the trial court to grant a pretrial motion to have the prosecutor, Mr. Gorder, recused from the case so that the defendant could call Mr. Gorder as a witness. The defendant also claims that the prosecutor exceeded the bounds of proper argument during closing argument and the defendant was thereby prejudiced. The final contention of error challenges the materiality of the defendant's allegedly perjurious statements regarding the blonde woman at the Omaha airport.

■ The defendant has also raised a claim of insufficiency of the evidence as to counts seven and eight of the indictment which charged the defendant with viola-

tions of the false statement statute, 18 U.S.C. § 1001. In essence, the government presented evidence that the defendant attempted to secure the release of his client Betty Powell through the submission of an appeal bond form that the defendant knew was not authorized by the named bond company. Viewing the evidence in the light most favorable to the prosecution we find the evidence presented sufficient to enable a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Nonetheless, for the reasons discussed in the balance of the opinion, we reverse the defendant's convictions on these and the other counts of the indictment.

### A. *The Propriety of a Prosecuting Witness*

The prosecutor in this case, Assistant United States Attorney Charles Gorder, was also the prosecutor in the previous trial of Betty Powell. Mr. Gorder not only opposed the defendant in that trial but also conducted the examination of the defendant in both the grand jury and bond proceedings that are the subject of defendant's perjury convictions in this case. Mr. Gorder was also involved in the discussions with the bond agency as to the adequacy of Mrs. Powell's bond collateral which gave rise to the defendant's false statement convictions. Finally, on several occasions Mr. Gorder negotiated directly with the defendant for the surrender of Ronald Powell, the fugitive whom the defendant was accused of harboring and giving aid. Thus, although he never took the stand, Mr. Gorder was a witness to, and indeed a participant in, some aspect of all of the events alleged in the indictment.

The defendant was charged and convicted of being an accessory after the fact to Mr. Powell's criminal offenses in that the defendant did "receive, relieve, comfort and assist Ronald Lee Powell in order to hinder and prevent his apprehension, trial and punishment," in violation of 18 U.S.C.

§ 3. During trial the principal defense asserted by the defendant to this count, and the harboring a fugitive charge, revolved around the defendant's efforts to successfully negotiate Mr. Powell's surrender with Mr. Gorder. Rather than harboring or assisting Mr. Powell, the defendant contended he was actively conducting the ongoing negotiations for Mr. Powell's timely surrender through direct communications with both Mr. Gorder and Mr. Powell. Obviously, this defense hinges substantially on the availability of evidence detailing the defendant's role in these surrender negotiations.

Both before and during the trial defense counsel unsuccessfully moved the court to recuse the prosecutor to enable the defense to call him as a witness. After final argument the defendant moved for a mistrial because the prosecutor's remarks "reaffirm[ed] Mr. Gorder's role as a witness in the case without cross-examination, because they appeared to be, in the way that they were framed, assertions of personal knowledge based on his dealings with Mr. Prantil." At every juncture, the prosecutor refused either to recuse himself or to testify. The trial court declined to disturb the prosecutor's decision and denied, without comment, all of the defendant's motions on this matter.

■ The prosecutor defended his decision, and the trial court concurred, on the grounds that his testimony was unnecessary and cumulative to the defendant's case. We recognize that a defendant has an obligation to exhaust other available sources of evidence before a court should sustain a defendant's efforts to call a participating prosecutor as a witness. *United States v. West,* 680 F.2d 652, 654 (9th Cir. 1982). Nonetheless, the defendant's obligation to resort to alternative means of adducing factual testimony is not absolute. Both the quality and quantity of the alternate sources of evidence are proper subjects for comparison with that sought directly from the participating prosecutor. For example, in this case the prosecutor contends that his testimony on the defend-

ant's efforts to arrange for the surrender of the fugitive Ron Powell was unnecessary and cumulative because the defendant could have presented some testimony on this point through an FBI agent who listened to some, but not all, of the relevant discussions. The prosecutor also avers that the defendant himself was available to testify as to any conversations for which there are no other witnesses besides the defendant and the prosecutor. The true worth of the prosecutor's generous suggestion that the defendant himself testify in order to "exhaust" all other sources of testimony, however, becomes self-evident when the prosecutor subsequently portrays the defendant's testimony as self-serving and "sleazy" in his summation before the jury.

■ Regardless of the prosecutor's view of the utility of his own testimony, the district judge is charged with the responsibility of making determinations as to the materiality of witness testimony. In so doing, the court must honor the defendant's constitutional rights under the confrontation and compulsory process clauses of the Sixth Amendment. The unequivocal admonition of the Supreme Court on this point bears repetition here:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

■ The district court in this case was not faced with a defense request to place the participating prosecutor on the stand for purposes of duplicative impeachment. *See United States v. Tamura,* 694 F.2d 591, 601 (9th Cir.1982). Rather, the defendant sought Mr. Gorder's testimony as to his knowledge of the facts vital to the defendant's defense to the charge of being an accessory after the fact. After all, Mr. Gorder was both a witness to and a participant in the factual events at issue. The prosecution has not even suggested that the defendant's efforts to obtain Mr. Gorder's testimony were motivated by any improper, unstated, purpose. Similarly, the government has not made any claim that Mr. Gorder's familiarity with the case was such that substitution of alternate counsel would work a hardship on the government's case. To the contrary, the defendant's request for Mr. Gorder's recusal was made well in advance of trial. Even assuming that the government had alleged hardship stemming from the substitution of alternate government counsel, the defendant's timely demand diminished, if not eliminated, any consequent inconvenience to the government's case. Accordingly, we find that the district court abused its discretion in denying the defendant's timely motion for the substitution of the participating prosecutor in order to permit the defense to subpoena the prosecutor as a witness. The defendant had a compelling need to call the participating prosecutor as a material witness. The government articulated no legitimate justification for interfering with the defendant's assertion of his confrontation rights. Finally, although the government attempts to justify its conduct by invoking the advocate-witness rule, proper analysis reveals that the government has evaded, not enforced, this rule and its aims.

The advocate-witness rule prohibits an attorney from appearing as both a witness and an advocate in the same litigation. This venerable rule is a necessary corollary to the more fundamental tenet of our adversarial system that juries are to ground their decisions on the facts of a case and not on the integrity or credibility of the advocates. Accordingly, adherence to this

time-honored rule is more than just an ethical obligation of individual counsel; enforcement of the rule is a matter of institutional concern implicating the basic foundations of our system of justice.

Other, more specific, policies are served by the advocate-witness rule in the context of a criminal prosecution. *See United States v. Birdman*, 602 F.2d 547, 553–55 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). First, barring testimony by the participating prosecutor "eliminates the risk that a testifying prosecutor will not be a fully objective witness given his position as an advocate for the government." *United States v. Johnston*, 690 F.2d 638, 643 (7th Cir. 1982) (en banc). Second, the rule prevents the prestige and prominence of the prosecutor's office from being attributed to testimony by a testifying prosecutor. *Id. See United States v. Cerone*, 452 F.2d 274, 288 (7th Cir.1971) (prosecutor not disqualified as a witness under the "awesome office" theory so long as prosecutor does not otherwise participate in trial), *cert. denied*, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972). Third, the rule obviates the possibility of jury confusion from the dual role of the prosecutor wherein the trier-of-fact is asked to segregate the exhortations of the advocate from the testimonial accounts of the witness. *United States v. Johnston*, 690 F.2d at 643. Naturally, the potential for jury confusion is perhaps at its height during final argument when the prosecutor must marshall all the evidence, including his own testimony, cast it in a favorable light, and then urge the jury to accept the government's claims. Hence there is a very real risk that the jury, faced with the exhortations of a witness, may accord testimonial credit to the prosecutor's closing argument. *Id.* Finally, the rule expresses an institutional concern, especially pronounced when the government is a litigant, that public confidence in our criminal justice system not be eroded by even the appearance of impropriety. *Id. See* Model Code of Professional Responsibility EC 5–9, 5–10.

The advocate-witness rule generally admits of only one solution to avoid the improprieties inherent in advocate testimony. Attorneys must elect in which capacity they intend to proceed, either as counsel or as a witness, and promptly withdraw from the conflicting role. The limited number of exceptions to this prohibition,[2] rather than undermining the strength of this hard and fast rule, reflect an understanding of the obvious hardships that rigid adherence necessarily places on litigants for the sake of the overriding benefit of our entire system of justice.

In operation, the advocate-witness rule contemplates that vigilant counsel for both sides will anticipate, if not prevent, a conflict in their roles during litigation. The rule envisions that as soon as the dilemma is anticipated the attorney will promptly discharge his ethical obligations by electing one of the two mutually exclusive paths that lie before him. The rule does not expressly prohibit an attorney from taking into account the relative strategic advantages of proceeding as a witness as opposed to continuing as an advocate when making his election decision. Placing the decision initially in the hands of the attorney-witness, and thus tacitly allowing such tactical considerations to come into play, can perhaps be justified on the policy ground that the attorney is in the best position to minimize the hardship that such a disruption works on his or her client's interests. When the proposed testimony is offered in support of the client's own case-

---

**2.** Such exceptions include those situations where: the proposed testimony relates to a purely formal or uncontested matter; the need for the testimony could not have been reasonably anticipated and the evidence is necessary to prevent a miscarriage of justice; and where a particular attorney's familiarity with a case is such that withdrawal will irreparably injure his client's case. *See* Model Code of Professional Responsibility EC 5–10 & accompanying footnotes. These exceptions are narrowly interpreted and "[w]here the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate." *Id.* EC 5–10.

in-chief, the rule simply forces the attorney to weigh whether his testimony or his advocacy is more valuable to his client's interests. When, however, the proposed testimony is germane to his adversary's case, the balance of hardships is no longer in equilibrium. Instead of merely mitigating the hardship to his client's cause, the attorney may wish to deprive an adversary of the benefits of his testimony by electing to appear as an advocate and not as a witness. Under the veil of "ethics," opposing counsel is deprived of a material witness while the witness, although unsworn, is permitted to be an advocate. This cannot be. The advocate-witness rule is aimed at protecting the integrity of the fact-finding process, not at distorting the process itself.

To be sure, courts have generally disfavored allowing a participating prosecutor to testify, at a criminal trial. *United States v. West*, 680 F.2d 652, 654 (9th Cir. 1982). This reluctance is understandable particularly when the defendant seeks to call the prosecutor as a witness. Regardless of who calls the participating prosecutor, there is no absolute bar to calling him as a witness. *Id.* Recognizing the possibility for abuse, however, this Circuit has required that a defendant demonstrate a "compelling need" before a participating prosecutor will be permitted to testify. *United States v. Tamura*, 694 F.2d 591, 601 (9th Cir.1982). The "compelling need" standard is a reiteration of the judicial antipathy toward any deviation from the advocate-witness rule. In the present case,

the defendant did not ask the trial court to bend the advocate-witness rule. Instead, the defendant sought the court's assistance in preserving the distinctions the rule was intended to uphold while affording the defendant access to perhaps the most important witness to the accessory charges, a participant in the transactions.

Surely the reasoning behind the advocate-witness rule does not contemplate that a material witness will be able to exempt himself from the rigours of the fact-finding process by electing to proceed as an advocate. The irony to which the rule was subjected should have been apparent from the very nature of the prosecutor's posture before the court. Invoking the "compelling need" standard, the witness, as an adversary, dutifully informed the court that in his opinion his testimony was of no value to his opponent's case. Despite defense counsel's objections to the contrary, the trial court, without comment, ratified the prosecutor's perspective on the exculpatory value, not the admissibility, of his own testimony. Questions on the materiality of the evidence are exclusively the province of judges, not litigants. As the prosecutor was a material witness and participant, it was the jury's responsibility, not that of the judge or prosecutor, to evaluate the import of the prosecutor's proposed testimony on the accessory charges. Permitting the prosecutor to continue in the capacity of an advocate only served to blur the fundamental distinctions that the advocate-witness rule was created to preserve.[3]

---

**3.** For example, during the presentation of the government's case-in-chief as it related to the § 1001 counts, the prosecutor engaged in the following dialogue with the agent from the bonding company:

By Mr. Gorder:
Q. Mr. Noriega, on the afternoon of August 4th, you came to my office; is that correct?
[By agent:]
A. Yes.
Q. That was to get my signature on the bond?
A. Yes.
Q. And do you recall what I told you that first time that you appeared that the bond was not correct as to form?
Mr. Iredale [defense counsel]: I object to the form of these questions because by put-

ting them, the prosecutor is, in effect, proffering himself as a witness.
The Court: No. Overruled.
By Mr. Gorder:
Q. Do you recall that?
A. Yes.
Q. What do you recall about that?
A. After I talked to you, you said you had to have more property or some more—there wasn't enough collateral.
. . . .
Q. Do you recall what I told you when you brought this bond without the appendix?
Mr. Iredale: I object to the prosecutor proffering himself as a witness by the form of the question.
The Court: That's absolutely incorrect. Overruled.

## B. *The Government's Summation*

 The defendant challenges his convictions not only on the basis that he was deprived of the prosecutor's testimony regarding matters in which Mr. Gorder participated but also on the ground that the prosecutor engaged in misconduct during his presentation of the government's summation to the jury. Admittedly, "counsel are necessarily permitted a degree of latitude in the presentation of their closing summations." *United States v. Potter*, 616 F.2d 384, 392 (9th Cir.1979), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980) (quoting *United States v. Rich*, 580 F.2d 929, 936 (9th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 330, 58 L.Ed.2d 331 (1978)). Courts must allow the prosecution the freedom to strike "hard blows" based on the evidence and all fair inferences therefrom, but courts may not permit "foul" blows. *United States v. Birges*, 723 F.2d 666 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984). Given the necessarily wide latitude accorded the government in making its final argument, distinguishing

hard blows from foul ones will invariably be a question of degree, and therefore not an easy task for precise measurement. Nonetheless, the Supreme Court has admonished that "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Consequently, we review the remarks of the prosecutor in, this case to determine whether he exceeded the bounds of proper argument.[4]

 A review of the prosecutor's remarks during the closing argument reveals that his statements, although derogatory and gratuitous by themselves, served to compound the prejudice to the defendant that flowed from Mr. Gorder's ambiguous role as both prosecutor and participant witness. The prosecutor's closing arguments illustrate the degree of actual prejudice that results when an advocate, through his direct participation in the events under litigation, can argue to the jury based on actual or perceived personal knowledge.[5]

> The Witness: Repeat the question, please.
> Mr. Iredale: May I have a continuing objection in that regard, your honor?
> The Court: Certainly.
> By Mr. Gorder:
> Q. Let me ask the question this way, Mr. Noriega: When you originally—you came to my office twice?
> A. Yes.
> Q. Mr. Bobbitt was there on both occasions?
> A. Yes.
> Q. The first time you brought in the bond, it did not have the appendix; is that correct?
> A. Right.
> Q. We told you that?
> A. Yes.
> Q. What did you do?
> A. You reviewed it and you said you got 30,000 in here, and it has some antiques and it has a house, too, and you said, "Do you know the retail value here is 30,000?" and I said "Yeah," and I looked at it. And previously I didn't really look at it that well, but anyway I looked at it and reviewed it, I asked "Hey, listen, if you don't want me to write the bond, I won't write it."
> Q. What was said in response to that?
> A. You said I was the bondsman, so forth, that was it. You're not making any indications to that effect.

Once again, the prosecutor stepped into the role of a witness to the transactions in dispute—a witness unavailable to the defense.

4. The government contends that this issue was not adequately preserved for purposes of appeal and therefore can be reviewed only for plain error. We disagree. Defense counsel entered his objections to the language and tenor of the prosecutor's closing remarks by way of a mistrial motion after the government finished its summation. This circuit has recognized this as an acceptable mechanism by which to preserve challenges to prosecutorial conduct in a closing argument in lieu of repeated interruptions to the closing arguments. *United States v. Lyman*, 592 F.2d 496, 499 (9th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979).

5. In winding up his closing argument, Mr. Gorder clarified his role in the case as follows:

> Ladies and Gentlemen, our system of justice is an advocacy system of justice and there are adversaries. In this particular case the United States is an adversary, Frank Prantil is an advisor. I represent the United States and Mr. Iredale represents the defendant. That system depends upon a certain minimum standard of behavior, a system where the attorneys are honest with each other and with

The prosecutor launched a personalized attack on the defendant's motives. A recurrent theme of the prosecutor's summation was to portray the defendant as "greedy,"[6] "corrupt," "dishonest," and "sleazy." The prosecutor cautioned the jury that the defendant did not meet the minimum standards of attorney behavior demanded by the "advocacy system of justice." As such, the prosecutor explained to the jury that "Mr. Prantil is the kind of person who gives lawyers a bad name to the general public and it's your duty as jurors to call him to account." The prosecutor charged the jury with the responsibility of ridding the ranks of the criminal defense bar of such a "crook" even though "it's true, thank God it's true, that criminal defense attorneys are not crooks as a general rule."

These comments came from an individual who was not only an experienced prosecutor but also, as the jury could not fail to appreciate, both a participant in many of the underlying events and Mr. Prantil's adversary throughout. As previously mentioned, Mr. Gorder had conducted the grand jury examination of the defendant that resulted in three of the defendant's perjury convictions. In his summation of the evidence on these counts, the prosecutor drew the jury's attention to the complete grand jury transcripts. Mr. Gorder informed the jury that these transcripts demonstrated that the defendant committed perjury "not just in the specific counts he's charged with, but in a number of other areas also." Once again, this is an assertion of personal knowledge of a testimonial rather than an argumentative character.

We review the entirety of the prosecutor's remarks under the harmless error rule, Fed.R.Crim.P. 52(a), to determine whether it is more probable than not that the improper remarks materially affected the verdict. *United States v. Lyman*, 592 F.2d 496, 499 (9th Cir.1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2864, 61 L.Ed.2d 300 (1979); *United States v. Dixon*, 562 F.2d 1138, 1143 (9th Cir.1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978). We can appreciate the delicate position that the prosecutor faced by virtue of his intimate knowledge of the facts in this case. Nonetheless, the prosecutor elected to assume this task, and, taking his comments as a whole, we find that they prejudiced the defendant. In conclusion, we find that the prosecutor exceeded the bounds of proper argument in his summation and it is more probable than not that his improper remarks materially affected the verdict.

### C. The Perjury Issue

Under 18 U.S.C. § 1623, a false statement before a grand jury does not constitute perjury unless it is material. 18 U.S.C. § 1623(a), (c)(1). *See United States v. Ponticelli*, 622 F.2d 985, 989 (9th Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). The defendant has questioned the materiality of a certain statement he made before the grand jury which constitutes the predicate for one of his perjury convictions. As previously mentioned, the defendant testified before the grand jury that a blonde woman picked him up at the Omaha, Nebraska airport, drove him to meet Ronald Powell, and transported him back to the airport. The evidence adduced at trial disclosed that no one performed this service for the defendant, but that the defendant did meet his sister-in-law at a restaurant during his trip to Omaha.

---

the court. Frank Prantil is not that kind of person. He was dishonest from day one until he walked off the stand on October 6th having said that everything was above the board. And it's your duty to call him to account for those actions, and I ask you to return verdicts of guilty on each count of the indictment. R.T. 116.

**6.** In his closing argument, Mr. Gorder refers to the defendant's explanation, contained in a tape recording, that the monies he collected represented his attorney's fees in part. In response to the defendant's taped statement that "I have a right to earn my living too," the prosecutor explains to the jury, "He talks about he's just picking up his fees, *again establishing his greed.*" R.T. 115 (emphasis added).

For purposes of 18 U.S.C. § 1623, false statements to a grand jury are material if they are relevant to any matter before the grand jury and their falsity " 'would have the natural tendency to influence the grand jury's investigations.' " *United States v. Ponticelli,* 622 F.2d at 989 (quoting *United States v. Kelly,* 540 F.2d 990, 993 (9th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977)). Questions of materiality in a perjury case are legal questions to be determined by courts and not juries. *Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929); *United States v. Bridges,* 717 F.2d 1444, 1448 & n. 18 (D.C.Cir.1983) (collecting cases), *cert. denied,* —— U.S. ——, 104 S.Ct. 1310, 79 L.Ed.2d 708 (1984). Hence, we must decide whether the defendant's testimony was material.

Initially, we decline to accept the government's contention, raised for the first time on appeal, that the defendant committed perjury by denying knowing who was with Powell in the Omaha area. No question concerning the identity of the person with Mr. Powell in the Omaha area was asked or answered in the grand jury proceedings. Further, the prosecutor's depiction of Mr. Prantil's actual remarks as an attempt to conceal the activities of his sister-in-law from the grand jury is somewhat puzzling in light of the fact that Mr. Gorder had, pursuant to Ms. Schmidt's prior agreement to cooperate with the government, full knowledge of her activities in and around the Omaha area. The only grand jury testimony elicited from the defendant focused on who picked up the defendant at the airport and who drove him back. The defendant said that a woman, whose name he couldn't recall, did so. In our view, this assertion could not have influenced the grand jury's investigation. The defendant's inaccurate testimony about a nonexistent woman at the airport could not have launched any further successful grand jury investigation.

The government's entire perjury theory on this count of the indictment depends in equal measure on the false premise that there was a woman at the airport and that this woman was the defendant's sister-in-law, whose identity the defendant wishes to conceal. The defendant, however, could not possibly be testifying falsely so as to shield a nonexistent woman. Similarly, the defendant's inability to recall the name of this nonexistent woman, a testimonial assertion that is hard to peg as a literal falsehood, could not have influenced the grand jury's deliberations. Simply put, if there was no blonde woman at the Omaha airport, the defendant's inability to recall her name is immaterial. Accordingly, because the defendant's testimony was not material, we hold that the defendant's conviction on Count Six is reversed.

CONCLUSION

To conclude, we reverse defendant's perjury conviction on Count Six of the indictment because the allegedly perjurious statements lack materiality. We reverse and remand the defendant's remaining convictions on the ground that the district court abused its discretion in refusing to recuse the participating prosecutor as a material witness and on the ground of prosecutorial misconduct in the government's closing argument.

REVERSED AND REMANDED.