[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTION TO DISQUALIFY THE OFFICE OF THE STATE'S ATTORNEY FOR THE WINDHAM JUDICIAL DISTRICT
The defendant in this case has filed a motion to disqualify the Windham State's Attorneys' office. The defendant claims that the actions of the State's Attorney Mark Solak and Assistant State's Attorney Debra Collins require the removal of the entire Windham State's Attorneys' office from continuing with this prosecution.
 ISSUE
Whether the Office of the State's Attorney for the judicial district of Windham should be disqualified from further prosecution of this case.
 DISCUSSION
"The trial court has the authority to regulate the conduct of attorneys and has a duty to enforce the standards of conduct regarding attorneys. . . . Since October, 1986, the conduct of attorneys has been regulated also by the Rules of Professional Conduct, which were approved by the judges of the Superior Court and which superseded the Code of Professional Responsibility. . . . The trial court has broad discretion to determine whether there exists a conflict of interest that would warrant disqualification of an attorney." (Citations omitted.)Bergeron v. Mackler, 225 Conn. 391, 397, 623 A.2d 489 (1993). CT Page 395 "The court may disqualify an attorney if the attorney has violated the Rules of Professional Conduct." Skirkanich v.Waterbury Hospital, Superior Court, judicial district of Waterbury, Docket No. 100686 (November 15, 1993, Sylvester, J.).
"The disqualification of a party's chosen counsel is a harsh sanction, and an extraordinary remedy which should be resorted to sparingly." (Internal quotation marks omitted.) Martini v.Shelter Rock Realty, Superior Court, judicial district of Waterbury, Docket No. 113425 (January 19, 1996, Pellegrino, J.). "The party moving for disqualification bears the burden of proving facts which indicate that disqualification is necessary." (Internal quotation marks omitted.) Temkin v. Temkin, Superior Court, judicial district of Litchfield, Docket No. 57629 (September 28, 1993, Pickett, J.).
Canon 9 under the former Code of Professional Responsibility provided that "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." Practice Book, 1978. The Supreme Court has concluded, however, that "the Rules of Professional Conduct do not expressly state that a lawyer should avoid the appearance of impropriety." Bergeron v. Mackler, supra. "Although considering the appearance of impropriety may be part of the inherent power of the court to regulate the conduct of attorneys, it will not stand alone to disqualify an attorney in the absence of any indication that the attorney's representation risks violating the Rules of Professional Conduct." Emphasis added.Bergeron v. Mackler, supra.
Even when Canon 9 was applicable, the Court rejected the notion that an appearance of impropriety, without more, was enough to disqualify an attorney. State v. Jones, 180 Conn. 443, 452-53,429 A.2d 936 (1980), overruled in part on other grounds, State v.Powell, 186 Conn. 547, 442, A.2d 939 (1982), cert. denied sub nom. Moeller v. Connecticut, 459 U.S. 838, 103 S.Ct. 85,74 L.Ed.2d 80 (1982); State v. Bunkley, supra, 202 Conn. 653-54. InState v. Jones, supra, 180 Conn. 452-53, the court relied on the second circuit's conclusion that "when there is no claim that the trial will be tainted, the appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." Board of Education of New York Cityv. Nyquist, 590 F.2d 1241, 1247 (2d Cir. 1979).
The Superior Court has consistently concluded that "the appearance of impropriety standing alone is not sufficient CT Page 396 grounds for the disqualification of an attorney where there is no claim that the representation involves a violation of the Rules of Professional Conduct." Palumbo v. Probate Court, Superior Court, judicial district of Waterbury, Docket No. 120614 (November 17, 1997, Vertefeuille, J.); accord Fallacaro v.Fallacaro, Superior Court, judicial district of Hartford, Docket No. 719606 (April 8, 1999, Bishop, J.).
Since an attorney cannot be disqualified on the sole basis of an appearance of impropriety, an alternative is to build a "Chinese Wall" around the attorney. A "Chinese Wall" is a screening procedure in which an impregnable system of protection is established to segregate an attorney from all of the information and material involved in a particular case. Wellnerv. Carroll, Superior Court, judicial district of Fairfield, Docket No. 27339 (January 6, 1995, Tierney, J.). Examples of "Chinese Wall" procedures that isolate an attorney from a particular case are: 1) Not permitting said attorney within the vicinity of the files while others are working on them; 2) Keeping the files locked and inaccessible to the attorney; 3) If one exists, the supervisor of the attorney will be bound by the above rules and procedures; 4) The attorney signs an affidavit and agreement that he/she will have no contact with the file nor discuss the file with anyone; and 5) The attorney(s) handling the file will have no direct contact with said attorney. Wellner v.Carroll, supra, Superior Court, Docket No. 27339.
In this case, however, as discussed below, a "Chinese Wall" will not be effective to guard against future problems, based upon the history of this case. Whatever safeguards, if any, to insulate the investigations in this case from Attorney Collins have failed, miserably.
This Court is aware that the disqualification of a State's Attorney, Assistant State's Attorney and/or an entire State's Attorney's office is a harsh sanction, which should not be taken lightly.
The judiciary is however, ultimately responsible for the enforcement of court rules and must use its inherent power over the administration of justice to prevent action that undermines the integrity of the system. Massameno v. Statewide GrievanceCommittee, 234 Conn. 539 at 567 (1995). Because the functions of a prosecutor clearly are an integral part of the judicial process, and because the judicial branch has an overlapping CT Page 397 interest in the administration of justice, the judicial branch must be able to exercise its own power of supervision over the judicial process and the attorneys who must be accountable to the court. Id. "The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . the standards are flexible and are to be determined in the interests of justice." State v.Pouncey, 241 Conn. 802 at 812 (1997). The trial court has broad discretion in determining whether an attorney should be disqualified. State v. Bunkley, 202 Conn. 629 (1987).
The Division of Criminal Justice and the Court recognize the authority of the Rules of Professional Conduct, The American Bar Association Standards for Criminal Justice Prosecution Function, and The National District Attorneys Association National Prosecution Standards. Massameno v. Statewide GrievanceCommittee, 234 Conn. 539 at 545, footnote 9 (1995). The ABA Standards for Criminal Justice, Prosecution Function, Standard3-1.3(f) provides that: "A prosecutor should not permit his or her professional judgment or obligations to be affected by his or her own political, financial, business, property, or personal
interests." (Emphasis added). Also, Section 7.1 of the NDAA, National Prosecution Standards regarding Conflict of Interest/Conflict Avoidance states that: "The prosecutor should avoid interests and activities which are likely to appear to, or in fact do, conflict with the duties and responsibilities of the prosecutor's office." (Emphasis added).
Rule 3.7(a) of the Rules of Professional Conduct provides that a lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness. This case does not fall within any of the well established exceptions to the general rule of Rule 3.7(a). There is no special exception for State's Attorneys. "Like all attorneys, prosecutors serve as officers of the court." Massameno v. Statewide Grievance Committee, supra at 555. In fact, prosecutors have always had an obligation to "seek the truth" and to "do justice". Massameno v. Statewide GrievanceCommittee, 234 Conn. 539, 557 (1995).
The defendant, however, has the burden of proof to "demonstrate a compelling need before a participating prosecutor will be permitted to testify . . . The defendant who wants to call (the) prosecutor as a witness must demonstrate that the testimony is necessary and not merely relevant, and (the defendant) must show CT Page 398 that he has exhausted other available sources of comparably probative evidence." State v. Thompson, 20 Conn. App. 290,296-297 (1989). Ullmann v. State, 230 Conn. 698, 716-717 (1994),United States v. Prantil, 764 F.2d 548, 554 (1984).
In this case, Attorney Collins has become overly involved in the various investigations, in spite of her obvious potential conflicts of interest. (Her husband's involvement in the Sheriff's department, her reaction to Attorney Meisler's letter, and ultimately her, and her husband's, personal lawsuits against Attorney Meisler.)
Attorney Collins will undoubtedly be called as a witness in this case. Not only will she be a witness, but she will be a witness with a potential conflict of interest under Rule 1.7(b) of the Rules of Professional Conduct. (". . . or by the lawyer's own interests . . ."). Not only will she be a witness, Attorney Solak and other members of the Windham State's Attorney"s office would be in violation of Rule 3.7, which states: "(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ". The rule also states that: "A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 . . .". Rules of Professional Conduct § 3.7(b). In this case Attorney Collinsdoes have a conflict under Rule 1.7. The other state's attorneys would also be precluded from participating in this case, under Rule 1.10(a) of the Rules of Professional Conduct, which states: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7 . . ."
This Court is mindful of the testimony of Professor Geoffrey Hazard in this case. Professor Hazard testified that the appearance of impropriety alone is not sufficient to cause the disqualification of an attorney. The Court agrees with Professor Hazard on this issue.
Professor Hazard further testified, however, that a lawyer should be disqualified if the lawyer's actions rise to the level of misconduct under Rule 8.4 of the Rules of Professional Conduct. That Rule states: "It is professional misconduct for a lawyer to: (4) Engage in conduct that is prejudicial to the administration of justice." CT Page 399
He opined that Attorney Collins' behavior had not risen to that level in this case. However, Professor Hazard, was not fully apprised of all the actions of Attorney Collins related to this case, the police investigations, her civil action against Attorney Meisler, and her substantive involvement in the original larceny investigation while her husband was working in the Sheriffs' department.
This Court has heard testimony in this case from approximately 35 witnesses during 12-13 days of trial. The Court has received 50 full exhibits during these hearings.
The Court feels that Attorney Collins has engaged in conduct which is prejudicial to The Administration of Justice. Rule 8.4(4). This will be discussed in greater detail below.
 FINDINGS
The Court makes the following findings regarding the activities of Assistant State's Attorney, Debra Collins, in connection with the larceny case against Thomas White:
 1. She helped organize evidence seized from financial institutions.
 2. She attended strategy sessions with IRS agents and with the "independent" auditors, Marien and Company.
 3. She developed a "Theory of the case" and discussed it with Detective Karen O'Connor, Inspector René Barbeau and
State's Attorney Mark Solak. (Attorney Collins referred to her theory as a "kiting scheme".)
 4. She discussed with her husband (Charles Collins), the fact that her office was involved with an on-going investigation of Thomas White, while her husband was working as a supervising deputy sheriff in the administration of the High Sheriff, James Kenney.
 5. She even advised her husband that he probably should seek a job elsewhere, after he had been offered a supervisor's job by the newly elected High Sheriff, Thomas White.
She engaged in all the above activities, even though she should not have, because of potential conflicts of interest, disclosure CT Page 400 of confidential information, and the appearance of impropriety. Her boss, State's Attorney Mark Solak, recognized that she should not have been involved in the Thomas White investigation, because her husband worked for High Sheriff James Kenney. (Thomas White had defeated James Kenney in a primary for High Sheriff in September 1998).
On October 19, 1999, I asked Mr. Solak the following question: "Is it your position that Attorney Collins likewise should not be disqualified, or are you conceding she should be disqualified and a Chinese Wall built around her and she should have no involvement with the case or are you dealing with both issues?"
He answered: "No, Your Honor, It was never my intent to have her be involved in the trial of this case in any way, shape, or form. So therefore, the issue of her disqualification, per say (sic.) is really moot. She's not going to be an attorney for the state on this case, never was, never will be." Emphasis added. Transcript October 19, 1999, page 12.
These motions for disqualification probably never would have been filed, if the representation by Atty. Solak was accurate. Unfortunately, as noted by the findings above, even if Attorney Solak originally intended for Attorney Collins to have no involvement in the larceny investigation, she had significant
involvement in the case. That had all occurred months before October, 1999, when Mr. Solak made his representation to the Court on the record.
In fact, Attorney Collins testified that she discussed her "kiting scheme theory" directly with Attorney Solak. This leads the Court to believe that Attorney Solak somehow failed to fully appreciate the inappropriateness of having Attorney Collins involved in the larceny investigation.
The situation only gets worse, in connection with all the other charges against Thomas White, Gloria Marion, and Henry Bourgeois (who has not joined in the motion to disqualify). Those charges arose from an internal investigation by the Sheriffs' department under the new administration of High Sheriff, Thomas White.
Certain activities took place at the end of May, 1999, when James Kenney was leaving office as High Sheriff. These activities included the shredding of documents, forms, and other papers in the sheriff's office on May 28, 1999. There were also certain CT Page 401 programs and documents removed from the computer in the sheriffs' department on that day or May 30, 1999. Also, certain property that might have belonged to the sheriffs' department was removed from the courthouse in Putnam on May 28 and/or May 30, 1999. There also was a set of prisoner transport logs, listing future court dates for prisoners that might have been destroyed before June 1, 1999, when the new High Sheriff took over the office. Finally, it appears that many files that had been kept by the sheriffs' department before June 1, 1999, were no longer there on June 1st.
For all these reasons, the new High Sheriff ordered an internal investigation to find out what happened to all the "missing" items. Through this investigation, it was learned that two of the people present in the sheriffs' office shredding documents on May 28, 1999 were Debra Collins, and a special deputy sheriff by the name of Aaron Auclair. Others present in the sheriffs' office at that time included High Sheriff James Kenney, Adele Dery, and special deputy sheriff Charles Collins. One of the people who apparently observed this shredding activity was a building maintenance person named John Wisnewski.
Attorney Arthur Meisler, on behalf of his client, Thomas White, sent a letter to Attorney Mark Solak, with a copy to Chief State's Attorney John Bailey, asking that Assistant State's Attorney Debra Collins be removed from this case for various reasons relating to her husband's involvement in the sheriffs' department, and the situation related to the shredding on May 28, 1999 in the sheriffs' office. Since shredding destroys documents, it was uncertain exactly what was shredded. It appeared, however, that many documents are missing. The destruction of some of the missing documents might have violated laws and regulations related to the destruction of public documents. Also, if any evidence relating to any potential criminal cases was destroyed, that could be a criminal violation.
Mr. Meisler's request to have Attorney Collins removed from the case was a reasonable request under the circumstances. He directed his letter through proper channels, to Attorney Solak and Attorney Bailey. At that point, there was no case pending, so he could not have filed a motion to disqualify her with the Court.
The State Police were also running an investigation of the May 28th and 30th activities in the sheriffs' office. Rather than CT Page 402 staying out of that investigation, Attorney Collins took the following steps on her own:
 1. Secured written statements from several of the people present in the sheriff's office on May 28, 1999. These statements were ultimately given to the State Police, in a packet of materials from Attorney Solak.
 2. Attorney Collins herself, or through Attorney Solak, asked the Connecticut State Police to take over an investigation from the Putnam Police Department involving John Wisnewski (the courthouse maintenance man who witnessed some of the shredding activities on May 28, 1999). Previously, Attorney Collins had made a complaint with the Putnam Police Department that Mr. Wisnewski was "stalking" her near her home in Putnam.
 3. She received Mr. Meisler's letter to Mr. Solak and Mr. Bailey (before Mr. Solak had seen the letter). She immediately went to Troop D of the Connecticut State Police to talk to a detective, who was described by her as a "friend". She testified that she was "visibly upset" by Attorney Meisler's letter. She said the detective or a sergeant who was also present told her the letter seemed like a "smoke screen" to divert attention from the pending criminal investigation. (The only investigations then
pending were the larceny case against Thomas White, the investigation of the May 28th shredding, and the John Wisnewski stalking case).
Immediately after her meeting with the State Police detective and sergeant the investigation turned and focused almost entirely on the activities related to the independent investigation by the sheriffs' department. That newly focused investigation resulted in multiple charges against Thomas White, Gloria Marion and Henry Bourgeois. (The long form informations contain 18 counts against both White and Marion).
It is important to note that Attorney Collins never discussed the Meisler letter with her boss, Attorney Solak, before taking it to her "friend" in the State Police. It must also be noted that there was no legitimate reason for her to take the letter to the State Police. To an outside observer, it appears she was trying to influence the direction of the investigation of the May 28th activities. CT Page 403
Although Mr. Solak later met with a different division of the State Police (Eastern District Major Crime Squad) to ask for a "complete investigation", he provided the State Police all the written statements that had earlier been secured by Attorney Collins. Also, the task force set up by the major crime squad utilized detectives, sergeants, and other investigators from Troop D, many of whom had worked closely with Attorney Collins.
It is inexplicable that the investigation quickly resulted in charges against White, Marion and Bourgeois without anyone, from the post-June 1st sheriffs' department being questioned. Other than what was in Attorney Meisler's letter, the State Police did not know what was allegedly taken or destroyed from the sheriffs' office on May 28th or 30th. Yet, they never interviewed anyone to find out. Needless to say, no charges have ever been filed relating to the May 28th — 30th incidents.
During this same period of time (July, 1999), Debra Collins and her husband Charles Collins were communicating regularly with Adam Auclair and Aaron Auclair, who soon became key witnesses against White, Marion, and Bourgeois. In fact some of the charges against those three people resulted exclusively from the statements of Adam Auclair and Aaron Auclair.
At the hearing on these motions to disqualify the State's Attorney's Office, Adam Auclair testified that his statements to the State Police were incomplete, misleading and false in material aspects related to several charges. In spite of his admissions at the hearing, Mr. Solak has given no indication that he intends to do anything to rectify that problem.
Accordingly, I will be asking the Chief State's Attorney's Office to re-investigate those charges directly related to Adam Auclair's statement. The Chief State's Attorney's Office should. also investigate whether Adam Auclair committed perjury in this hearing, or gave a false statement to the police regarding the following:
 1. His claim that he was "held" in a locked room by Gloria Marion;
2. His claim that Marion "told" him to lie;
 3. His testimony regarding the preparation of his resignation CT Page 404 letter, and whether or not he discussed the wording of the letter with his brother, Aaron.
The Chief State's Attorney's Office should also investigate Aaron Auclair's statement to the police and his testimony in court.
In particular, regarding Aaron Auclair:
 1. Did he violate any laws when he tape recorded his conversations with Gloria Marion and Thomas White, without disclosing that he was taping them?
 2. Did he remove any programs or other documents from the computer in the sheriffs' office on May 28th or May 30th? If yes, were these documents or programs put into the computer by him or anyone else, while being paid by the sheriffs' department? If yes, were these documents or programs property of the sheriffs' department?
 3. Is his written statement to the police true and complete in all respects?
 4. Did he commit perjury in this hearing, with respect to his testimony regarding the preparation of his resignation letter to the sheriffs' department? Did he commit perjury when he testified that he did not discuss the language of his resignation letter with anyone, including his brother, before he submitted the letter to High Sheriff White?
It is quite apparent from the testimony in this case that there is a close connection between Assistant State's Attorney Debra Collins and the Auclair brothers, Adam and Aaron. She obviously provided some counsel to them before they cooperated with the State Police. She even drove Aaron to the State Police Barracks (Troop D) to introduce him to the detectives. They both testified that she did this so Auclair's car wouldn't be seen at the Barracks. That occurred on the day Aaron surreptitiously tape recorded his meeting with Thomas White. The day before, he had secretly recorded his meeting with Gloria Marion, and played the tape for Attorney Collins.
Sometime after the resignations of the Auclair brothers from the sheriffs' department, both Auclair brothers have filed lawsuits against Attorney Meisler, Thomas White and Gloria Marion CT Page 405 for money damages. Attorney Debra Collins and her husband, Charles, have filed a civil action against Attorney Meisler for money damages.
Coincidentally, the two Auclairs and the two Collins are all represented by the same lawyer. The Auclairs' testified that they did not discuss their choice of attorneys with either of the Collins. The Collins each testified that they did not discuss their choice of attorney with either of the Auclairs.
It is clear that Attorney Debra Collins will be called as a witness at various stages of this trial. She will certainly be a material witness. Her actions in connection with these criminal investigations will be carefully scrutinized.
Her possible ethical violations include:
 1. Disclosure of confidential information regarding a pending criminal investigation being handled by her office; Rule 1.6(a);
 2. A possible conflict of interest in the Thomas White larceny case, due to her husband's employment in the sheriffs' office; Rule 1.7 and Rule 8.4(4);
 3. A possible conflict of interest regarding the May 28th incident in the sheriffs' department due to her participation (which might have been innocent or it might not have) and her husband's possible involvement in destruction or removal of sheriffs' department property; Rule 1.7 and Rule 8.4(4);
 4. An appearance of impropriety: (which alone is not a basis to disqualify a lawyer, but it is a factor to consider when there are other possible ethical violations, as well);
 5. A possible violation of § 8.4(4) of the Code of Professional Responsibility by potentially interfering with the administration of justice, by her very aggressive involvement in the pending police investigations in June and July, 1999.
 6. A possible conflict of interest resulting from the fact that she has sued Attorney Meisler for money damages, while these cases are pending. Rule 1.7.
CT Page 406
 Paragraphs 2, 3, 4, and 6 above also represent possible violations of:
 1. ABA Standards for Criminal Justice, Prosecution Function, Standard 3-1.3; and
 2. NDAA, National Prosecution Standards regarding conflict of interest/conflict avoidance § 7.1.
As indicated above, Attorney Collins is likely to be called as a material witness for the defense in this case. Normally, the testimony of one lawyer in the office would not require disqualification of the entire office. In this case, however, the disqualification of the entire Windham State's Attorney's office is necessary.
The Court also takes Judicial notice of the latest charges filed against the defendant Thomas White, four days ago. These were filed under docket number CR 11-107163. These additional charges were filed while the motions to disqualify the Windham State's Attorney's office were pending.
The fourth count in that case is an alleged violation of corrupt elections practices. Connecticut General Statutes § 9-333d(6) and 9-333x(10). The witness in that count is a person named Frank Cooley of Dayville, Connecticut. The State's Attorney concedes that Mr. Cooley is the grandfather of Rene Barbeau's step-son. Mr. Barbeau is an employee of the Criminal Justice Division in the Windham State's Attorney's office. As evident by defendants exhibit 37, the written policy of the State's Attorney Mark Solak is:
 "Division of Criminal Justice attorneys employed in the Windham Judicial District should not handle cases involving employees of the Division of Criminal Justice working within the Windham Judicial District or cases involving their immediate families. This should be clear to you and easy to follow."
It is arguable that Mr. Cooley is not a member of Mr. Barbeau's "immediate" family. However, it makes no sense to allow this issue to be injected into this case.
Sometimes we forget the basics. As a reminder, I will repeat CT Page 407 the oath given to attorneys in Connecticut, when they pass the bar and are sworn in. It reads:
 "You do solemnly swear that you will do no falsehood, nor consent to any to be done in court, and, if you know of any to be done, you will give information thereof to the judges, or one of them, that it may be reformed; you will not wittingly or willingly promote, sue or cause to be sued, any false of unlawful suit, or give aid, or consent, to the same; you will delay no person for lucre or malice; but will exercise the office of attorney, within the court wherein you may practice, according to the best of your learning and discretion, and with fidelity, as well to the court as to your client; so help you God."
Although Attorney Collins' involvement in these cases should have been prohibited from the beginning, Attorney Solak failed to erect a "Chinese Wall" around her, which would have insulated her from contact with the investigation. He failed to do so, when she injected herself into the Thomas White larceny investigation in April, 1999. Even after she was implicated in the shredding of papers in the sheriffs' office on May 28, 1999, he still did not remove her from the cases. In July, 1999 he learned that she took Attorney Meisler's letter directly to State Police detectives, but he still did not formally remove her from the cases.
Knowing all that had taken place before October, 1999, Attorney Solak represented to the Court, on the record, that Debra Collins was never involved in these cases. He stated that she: "never was, never will be." (Transcript October 19, 1999, page 12.) That representation to the Court indicates that Attorney Solak either
is terribly mistaken as to the extent of Attorney Collins' involvement in these cases or he has not been candid with the Court which would be a violation of Rule 3.3(a)(1). Whichever is correct, the proper administration of justice is greatly at risk if the Windham State's Attorney's Office remains involved in these cases.
The defendant's motion to disqualify the Windham State's Attorney's Office, Attorney Solak, and Attorney Collins isGranted.
Accordingly, it is hereby ORDERED:
 1. The State's Attorney's Office of the Windham Judicial CT Page 408 District shall cease its involvement in the Thomas White and Gloria Marion cases forthwith;
 2. State's Attorney Mark Solak and Assistant State's Attorney Debra Collins shall turn over all files that they have in connection with all the Thomas White and Gloria Marion cases to Chief State's Attorney John Bailey (or his designee) within 48 hours.
Furthermore, the Court requests the Chief State's Attorney's office to conduct investigations detailed in this decision regarding Adam Auclair, Aaron Auclair, Debra Collins and Charles Collins.
The Court also requests the Chief State's Attorney's office to conduct a thorough investigation into the activities related to the closing of the Office of High Sheriff James Kenney with respect to destruction of records, removal of property, and possible tampering with computer programs.
The Court requests the Chief State's Attorney's Office to assign these cases to a State's Attorney (or Deputy or Assistant) to handle these files to conclusion. The designated State's Attorney(s) shall file appearances in these cases within one week.
These cases are continued to Monday, February 7, 2000 at 10:00 A.M. for compliance review and a status conference.
BY THE COURT
Honorable Jonathan J. Kaplan