UNITED STATES of America,
Plaintiff-Appellee,

v.

George Michael GWALTNEY,
Defendant-Appellant.

No. 84–5173.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1986.

Decided June 2, 1986.

Richard B. Kendall, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

John J. Cleary, Cleary & Sevilla, San Diego, Cal., for defendant-appellant.

Before WALLACE, FARRIS, and NORRIS, Circuit Judges.

FARRIS, Circuit Judge:

At about 5:00 p.m. on January 11, 1982, twenty-three-year-old Robin Bishop departed Los Angeles driving alone to her home in Las Vegas. At 9:23 p.m. on the same date, defendant George Michael Gwaltney, then an officer with the California Highway Patrol, reported by radio that he had discovered a woman's body beside a frontage road just off Interstate 15 some 30 miles northeast of Barstow, California. Robin Bishop had been killed by a single bullet that entered the back of her head. Bruises on her wrists indicated that she had been handcuffed ten to twenty minutes before she died. Autopsy revealed fresh semen in her vaginal cavity.

Two state-court murder trials in which Gwaltney was defendant culminated in hung juries. A federal indictment was thereafter returned charging that Gwaltney, acting under color of law, willfully assaulted and shot Bishop, thereby causing her death and violating her constitutionally protected right not to be deprived of life or liberty without due process of law. 18 U.S.C. § 242. Gwaltney pleaded not guilty and the matter proceeded to trial. On May 10, 1984, after six weeks of trial and one day of deliberation, a jury found Gwaltney guilty as charged. On June 25, 1984 the district court entered judgment on the verdict and committed Gwaltney to prison for a period of ninety years, "the defendant to become eligible for parole pursuant to 18 U.S.C. 4205(b)(1) [after] serving a minimum term of 30 years." Gwaltney filed a timely notice of appeal on July 2, 1984. Fed.R. App.P. 4(b). He challenges the conviction and the sentence.

The district court had original jurisdiction pursuant to 18 U.S.C. § 3231. Jurisdiction in this court is based on 28 U.S.C. § 1291.

THE CONVICTION

## I.

At trial the government adduced considerable evidence concerning the characteristics of defendant's semen, the semen removed from Bishop's vaginal cavity during autopsy, semen stains found on the back seat of the patrol car driven by Gwaltney on the night of the murder, and semen stains found on the blue jeans worn by Bishop on the night of her death. Analysis of the semen removed from Bishop's vaginal cavity revealed that the donor had type A blood and secreted his typing antigen into his semen. It is undisputed that some 29% of the male population are type A secretors. Dried semen found on the back seat of the patrol car was also found to have been donated by a type A secretor, as was the dried semen found on Bishop's blue jeans. An enzyme found in the semen of 40% of the population, PGM $1+1+$, was also identified in the semen stain found on

the back seat of the patrol car. According to undisputed expert testimony, the occurrence of this enzyme is independent of blood type and secretor status. Analysis of a semen sample taken from Gwaltney revealed that he is a type A secretor exhibiting the PGM $1+1+$ enzyme. Additionally, Dr. Edward Blake, the prosecution's forensic serologist, testified that using a relatively new procedure known as an immunobead assay, he detected anti-sperm antibodies in a sample of Gwaltney's semen, as well as in the semen stains found on Bishop's jeans and on the back seat of the patrol car. According to the testimony at trial, anti-sperm antibodies occur in less than 5% of the male population.

Gwaltney contends that no evidence concerning detection of anti-sperm antibodies should have been admitted for any purpose as the government failed to demonstrate that the principle upon which such evidence was based was " 'sufficiently established to have gained general acceptance in the particular field to which it belongs.' " *United States v. Kilgus*, 571 F.2d 508, 510 (9th Cir.1978), *quoting Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). Additionally, he contends that the trial court erred in admitting statistical evidence concerning the percentage of the population sharing Gwaltney's seminal characteristics as such evidence was confusing to the jury and unduly prejudicial.

## A.

The general test regarding the admissibility of expert testimony is whether the jury can receive "appreciable help" from such testimony. *United States v. Solomon*, 753 F.2d 1522, 1525 (9th Cir. 1985). *See also United States v. Awkard*, 597 F.2d 667, 669 (9th Cir.), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979) *and* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 383 (1979); *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973). Testimony concerning the results of a fundamentally unreliable test procedure is of scant value to a jury. *See generally United States v. Downing*, 753 F.2d 1224, 1237–

39 (3d Cir.1985). The trial judge "has wide discretion in determining whether particular scientific tests are sufficiently reliable to permit expert testimony based upon their results." *United States v. Bowers,* 534 F.2d 186, 193 n. 7 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976). *See also Solomon,* 753 F.2d at 1525 ("The necessary balancing of the probative value of the evidence against its prejudicial effect is committed to the discretion of the trial court."). Her decision to admit evidence concerning antisperm antibodies will not be disturbed unless "manifestly erroneous." *See Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). *See also Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *United States v. Falsia,* 724 F.2d 1339, 1341 (9th Cir.1983).

■ We agree that as the immunobead assay has yet to gain general judicial recognition, "the proponent of such evidence has the burden of laying a proper foundation showing the underlying scientific basis and reliability of the expert's testimony." *United States v. Marshall,* 526 F.2d 1349, 1360 (9th Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 376 (1976). *See also Falsia,* 724 F.2d at 1341 ("The burden of laying a proper foundation showing the underlying scientific basis and reliability of expert testimony is on the proponent of such evidence."). Having reviewed in meticulous detail the transcripts of the pretrial hearing on Gwaltney's motion to exclude and the government's lengthy offer of proof at trial, we conclude that the government presented ample evidence that the immunobead assay is sufficiently reliable to warrant admission of Dr. Blake's testimony concerning the detection of antisperm antibodies.

■ Gwaltney did not contest the validity of the antibody theory expounded by the government's experts. The testimony of Dr. Blake, together with that of Dr. Richard Bronson, established the scientific basis underlying the immunobead assay pro-

cedure. To the extent Gwaltney complains of the application of the procedure in this instance, he does so in the wrong forum. Criticism of the application of a valid test in a particular instance bears on weight, not admissibility. *Bowers,* 534 F.2d at 193–94. Gwaltney had ample opportunity to cross-examine the government's experts concerning the controls employed by Dr. Blake and to present conflicting expert testimony. The jury was properly instructed to give the expert testimony such weight as it deserved.

### B.

■ Gwaltney's contention that the government impermissibly established his identity "by mathematical formula," is without merit. He "has no quarrel with the statistical evidence that he was part of the 29% of the population who are Type A secretors or that his PGM 1 plus 1 [sic] group constitutes 40% of the population." Instead, he contends that the court erred in admitting testimony that these independent characteristics occur together in only 12% of the male population. While "the interjection into the criminal trial process of sophisticated theories of mathematical probability raises a number of serious concerns," *United States ex rel. DiGiacomo v. Franzen,* 680 F.2d 515, 518 (7th Cir.1982), Gwaltney has not suggested how simple multiplication of the percentages of the population sharing the seminal characteristics exhibited by Gwaltney was so potentially confusing or misleading as to require exclusion. Statistical evidence is not inadmissible per se. *See, e.g., United States v. Kennedy,* 714 F.2d 968, 971 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984); *Scott v. Perini,* 662 F.2d 428, 430 (6th Cir.1981), *cert. denied,* 456 U.S. 909, 102 S.Ct. 1758, 72 L.Ed.2d 167 (1982). Any potential prejudice was not so pronounced as to render admission of the testimony an abuse of discretion, particularly in light of the instruction given by the trial judge concerning the permissible use

of this evidence.[1] Nor is there any record support for Gwaltney's implication that the government employed the statistics in an attempt "to assign a *number* to the probability of guilt or innocence." *People v. Collins*, 68 Cal.2d 319, 330, 438 P.2d 33, 40, 66 Cal.Rptr. 497, 504 (1968). The prosecution did not argue, or even obliquely suggest, that the percentage of the population sharing the seminal characteristics exhibited by Gwaltney could in any way be used to predict the "odds" that Gwaltney was guilty.

Gwaltney further contends that reversal is warranted because the prosecutor, in violation of the trial court's instructions, multiplied the 12% figure by the 5% of the population believed to have antisperm antibodies thereby further limiting the class of individuals who could have contributed the semen found on the seat of the patrol car. During closing argument, the prosecutor suggested the multiplication to the jury, though he did not perform it explicitly:

> The defendant is in a group of 12 percent of the population when you take the Type A blood and the PGM 1 plus 1 plus that could be responsible for the semen on that patrol car seat, and he is in 5 percent of that 12 percent that have the antisperm antibodies, and those are independent variables, as you learned.

The suggestion is neither misleading nor confusing. Nor does the context betray an attempt by the government to reduce the ultimate question of innocence or guilt to one of mathematical probabilities. Whether the prosecutor violated an explicit instruction from the trial judge is a matter between judge and prosecutor. It does not infect the conviction. It was not plain error for the trial judge to allow this argument in the absence of a defense objection.

## II.

On the day after Bishop was murdered, Victoria Graham, a dispatcher with the California Highway Patrol, asked Gwaltney whether the woman whose body he had discovered the previous night was "cute." Over Gwaltney's objection Graham testified that Gwaltney responded: "No, she was a dog." Gwaltney argues that the remark was irrelevant and highly prejudicial. While he fails to challenge specifically its admission we infer such a challenge from his comments concerning relevancy. Gwaltney further contends that the court abused its discretion by failing to prevent the prosecutor from referring to the "dog" remark in closing argument, despite the absence of a contemporaneous objection.

We need not decide whether the trial court abused its discretion in admitting Graham's testimony concerning Gwaltney's reference to Bishop as a "dog." It is more probable than not that the admission of testimony concerning the "dog" remark "did not materially affect the verdict." *United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1983), *citing United States v. Valle-Valdez*, 554 F.2d 911 (9th Cir.1977). *See also* Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); and Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded").

In the absence of an objection by defense counsel, a prosecutor's remarks in closing argument are reviewed only for plain error. *United States v. Young*, ⸺ U.S. ⸺, 105 S.Ct. 1038, 1046, 84 L.Ed.2d

---

**1.** The court instructed the jury as follows:

> Ladies and gentlemen, you are about to hear testimony about anti-sperm antibodies, which is being received for a limited purpose. That limited purpose is to show, if you find that it does, whether certain classes of individuals could not have contributed the semen found on Robin Bishop's jeans or on the seat of the Highway Patrol unit driven by the defendant on January 11, 1982, and to show, if you find that it does, whether there is any association between the stains found on the patrol car seat and the stain on Robin Bishop's jeans. You shall not however, consider evidence of anti-sperm antibodies as showing that it was of necessity defendant's semen in either location.

1 (1985). Fed.R.Crim.P. 52(b) authorizes the courts of appeals to correct only "particularly egregious errors," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The prosecutor's references to defendant's characterization of the victim as a dog, even if injudicious, were not "particularly egregious" within the meaning of *Frady. See Young,* 105 S.Ct. at 1046–49.

### III.

On January 16, 1982, five days after the murder, Detective Lynn Waggoner of the San Bernardino County Sheriff's Office visited numerous gun shops in the Barstow area to determine whether anyone had attempted to purchase parts for a Smith and Wesson Model 19 revolver, by then apparently believed to be the type of weapon with which Robin Bishop had been killed. At that time, William Addington, owner and operator of the Powder Horn Gun Shop in Barstow, denied that anyone had visited his shop in search of such parts.

At trial, Addington testified that Gwaltney had visited his gun shop the day after the Bishop homicide in search of a barrel for a Smith and Wesson Model 19 revolver. Addington admitted that he had withheld this information from authorities throughout the state-court proceedings. Addington further testified that in May 1983, in the course of an informal conversation in his shop concerning the entry of the FBI into the Bishop case, he revealed that Gwaltney had lied "about his gun" during the state-court proceedings. Over Gwaltney's hearsay objection, John Landrum testified that he overheard Addington state "that the day following the death of Miss Bishop, ... a highway patrolman came in and inquired concerning the barrel to fit a model 19 Smith and Wesson pistol."

■ A prior consistent statement is admissible to rehabilitate a witness accused of recent fabrication, Fed.R.Evid. 801(d)(1)(B), if the statement was made before the witness had a motive to fabricate. *United States v. Rohrer,* 708 F.2d 429, 433 (9th Cir.1983). Gwaltney contends that Landrum should not have been permitted to testify as to the comments he overheard Addington make because the statements were not made prior to the fabrication, which Gwaltney incongruously asserts was Addington's denial in January of 1982 that Gwaltney had come into his gun shop seeking a replacement barrel.

The fabrication of which the rule speaks is the alleged fabrication underlying the witness's trial testimony, not some fabrication resulting in a prior inconsistent out-of-court statement, as Gwaltney suggests. *See United States v. Stuart,* 718 F.2d 931, 934 (9th Cir.1983). The trial court did not abuse its discretion by admitting Landrum's account of Addington's out-of-court statement.

### IV.

■ Gwaltney attempted to persuade the jury that an unidentified person broke into his house and stole his gun in an attempt to frame him for the murder of Robin Bishop. Despite the testimony of certain police officers that Gwaltney's house had not been burglarized, the trial court excluded testimony offered by Gwaltney of signs of forced entry into his home detected by a defense investigator during the second trial.

A court's evidentiary rulings will be overturned only for abuse of discretion. *Rohrer,* 708 F.2d at 432. As we do not have a firm and definite conviction that the trial court committed a clear error of judgment, *Potlatch Corp. v. United States,* 679 F.2d 153, 157 (9th Cir.1982), in excluding evidence that 15 months after the murder the lock on a sliding glass door on Gwaltney's home showed signs of forced entry, we cannot say that the trial court abused its discretion. In any case, reversal would be unwarranted unless we were to find it more probable than not that the alleged

error affected the verdict. *Id.* The record precludes such a conclusion.

### V.

In response to a defense summation characterized by the district court as "a considerable and very hard attack on the integrity of the government and the prosecutor," the prosecutor opened his rebuttal argument with a series of references to what he termed the misrepresentations of defense counsel. Defense counsel objected to this "personal attack" and the prosecutor agreed to soften his rhetoric. Gwaltney argues that the prosecutor's comments, both before and after the defense objection, amounted to misconduct warranting reversal.

■ "[C]ounsel are necessarily permitted a degree of latitude in the presentation of their closing summations." *United States v. Prantil,* 764 F.2d 548, 555 (9th Cir.1985), *quoting United States v. Potter,* 616 F.2d 384, 392 (9th Cir.1979), *cert. denied,* 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980). While courts must allow the prosecution to strike "hard blows" based on the evidence presented and all reasonable inferences therefrom, they may not permit "foul blows." *Prantil,* 764 F.2d at 555. *See also United States v. Young,* — U.S. —, 105 S.Ct. 1038, 1042, 85 L.Ed.2d 1 (1985); *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Given the necessarily wide latitude accorded counsel in summation, distinguishing the foul from the fair "will invariably be a question of degree, and therefore not an easy task for precise measurement." *Prantil,* 764 F.2d at 555.

The Supreme Court has admonished counsel to refrain from "unfounded and inflammatory attacks on the opposing advocate." *Young,* 105 S.Ct. at 1043. *See also* ABA Standards for Criminal Justice 4–7.8 at 4.99 ("A personal attack by the prosecutor on defense counsel is improper."). Still, "[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Young,* 105 S.Ct. at 1045. Rather, "the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Id. See also United States v. Birges,* 723 F.2d 666, 672 (9th Cir.) ("Improprieties in counsel's arguments to the jury do not constitute reversible error 'unless they are so gross as probably to prejudice the defendant....' "), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984), *quoting, United States v. Parker,* 549 F.2d 1217, 1222 (9th Cir.), *cert. denied,* 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). The "invited reply" or "invited response" rule has been invoked to ensure inquiry into the fairness of the trial as a whole. *See Young,* 105 S.Ct. at 1044–46; *Lawn v. United States,* 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 323 n. 15, 2 L.Ed.2d 321 (1958).

> [T]he reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. Thus the import of the evaluation has been that if the prosecutor's remarks were "invited," and did no more than respond substantially in order to "right the scale," such comments would not warrant reversing the conviction.

*Young,* 105 S.Ct. at 1045.

■ The prosecutor did not overstep the bounds of proper advocacy in addressing what he perceived to be defense counsel's "misrepresentations" of the record. Viewed within the context of the entire trial, particularly in light of the equally forceful remarks of defense counsel, the remarks were well within the range of proper advocacy. Further, the record would not support a conclusion that it is more probable than not that the remarks materially affected the verdict. *See Prantil,* 764 F.2d at 556.

■ Referring to certain government witnesses, the prosecutor stated: "[T]hese men who testified here, ladies and gentlemen, are professionals and they will have to tell the truth." Defendant contends that

this characterization of government witnesses "removed the issue of credibility assessment from the jury," thus warranting reversal.

We recognize that "[a] prosecutor commits misconduct if the jury can reasonably believe that he 'was indicating a personal belief in the witness's credibility.'" *United States v. Tham*, 665 F.2d 855, 862 (9th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982), *quoting United States v. Roberts*, 618 F.2d 530, 537 (9th Cir.1980). Gwaltney failed to enter a contemporaneous objection, thus depriving the trial court of the opportunity to take remedial action. We therefore review only for plain error. Fed.R.Crim.P. 52(b). *See Young*, 105 S.Ct. at 1046–47; *Birges*, 723 F.2d at 672. "[C]ounsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the [prosecutor's] comments to the jury were improper and prejudicial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–39, 60 S.Ct. 811, 851–52, 84 L.Ed. 1129 (1940). Evaluating the challenged "vouching" against the backdrop of the entire record, *see Young*, 105 S.Ct. at 1047, the prosecutor's comment fails to rise to the level of plain error. The statement, even if inappropriate, was not "such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young*, 105 S.Ct. at 1047.

## VI.

Gwaltney's remaining assignments of error are without merit.

■■■ Evidence that Gwaltney and a woman friend had visited a "secluded spot" near the murder scene was admitted upon a stipulation offered by Gwaltney. Stipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions. *United States v. Campbell*, 453 F.2d 447, 451 (10th Cir.1972). That Gwaltney offered the stipulation to avoid possible admission of the evidence in more damaging form does not render the stipulation involuntary.

Having stipulated to the admission of evidence concerning his familiarity with the "secluded spot," Gwaltney will not now be heard to suggest that the prejudicial effect of the statement outweighed its probative value.

■■■ Had Gwaltney called a police officer to testify to his reputation for nonviolence, the government proposed to rebut with testimony concerning Gwaltney's allegedly lascivious search of a female motorist. When the district court expressed an inclination to allow such rebuttal, defendant elected not to call the officer. If, as Gwaltney asserts, "important, credible defense character witnesses" thereby failed to testify, it was as a result of counsel's tactical decision. The district court made no reviewable ruling on the admissibility of the proposed rebuttal testimony.

■■■ Finally, the challenged jury instructions, viewed "in the context of the overall charge," *United States v. Park*, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975), *quoting Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973), fairly and adequately covered the issues presented. *United States v. Marabelles*, 724 F.2d 1374, 1382–83 (9th Cir.1984). (1) As the court instructed, "it is not necessary for the government to prove the defendant was thinking in constitutional terms at the time of the incident, for a reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *See e.g., United States v. Ellis*, 595 F.2d 154, 161–62 (3d Cir.), *cert. denied*, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979). (2) The use of an example of conduct engaged in under color of law neither usurped the function of the jury nor suggested that one who wears a uniform and carries a firearm necessarily acts under color of law. The instruction, read as a whole, properly focused attention on whether Gwaltney acted or purported to act under color of law in assaulting or shooting Robin Bishop. *Cf. United States v. Screws*, 325 U.S. 91, 65 S.Ct. 1031, 89

L.Ed. 1495 (1945). (3) The court instructed the jury that the government was obliged to prove that Gwaltney deprived Bishop of a right secured or protected by the Constitution or laws of the United States; that the right not to be deprived of life or liberty without due process of law is such a right; that the right to liberty includes the principle that no person may be physically assaulted, intimidated, or otherwise abused intentionally and without justification by a person acting under color of state law; and that the right not to be deprived of life without due process of law prohibits a police officer acting under color of law from killing any person without justification. Gwaltney did not object to this instruction. It was not plainly erroneous. The record precludes any danger that the jury would convict Gwaltney for violating state rules of procedure. *United States v. O'Dell*, 462 F.2d 224 (6th Cir.1972), is inapplicable.

The conviction is affirmed.

THE SENTENCE

■ The district court sentenced Gwaltney to "imprisonment for a maximum term of 90 years" and ordered that Gwaltney "become eligible for parole under 18 U.S. Code, Section 4205(b)(1) upon serving a minimum term of 30 years." Gwaltney contends that by requiring that he serve 30 years before becoming eligible for parole, the trial court exceeded its sentencing authority.

Parole eligibility is governed by 18 U.S.C. § 4205. Section 4205(a) provides:

Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law.

Under § 4205(a) a federal prisoner serving a term of more than a year automatically becomes eligible for release on parole after serving one-third of the prescribed sentence or ten years, whichever is less. Gwaltney contends that § 4205(a) delimits the power of the sentencing judge to pre-

scribe a minimum term of incarceration. However, § 4205(b) plainly provides the sentencing judge alternatives to the automatic eligibility of § 4205(a):

Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and the best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commissioner may determine.

Read in conjunction, sections 4205(a) and 4205(b) provide that a federal prisoner sentenced to more than a year's incarceration automatically becomes eligible for parole after serving one-third of his sentence or ten years, whichever is less, unless the sentencing judge 1) specifies in the sentence a minimum period of incarceration, which minimum may not exceed one-third of the maximum sentence imposed, or 2) sets a maximum period of incarceration and specifically commits all consideration of appropriate release date to the discretion of the parole commissioner. Gwaltney's contention that § 4205(b)(1) permits the sentencing judge to advance the date of parole eligibility otherwise established under § 4205(a) but does not authorize the judge to postpone the date of eligibility beyond ten years is thus inconsistent with the plain language of the statute. Section 4205(a) provides for automatic eligibility after service of one-third of the designated sentence or ten years, whichever is shorter, *except as otherwise provided by law.* Section 4205(b)(1) provides otherwise, but does not distinguish between advancement and postponement of parole eligibility.

The legislative history relied on by Gwaltney is inconclusive at best. There is no indication that the comments of Senator Hruska[2] and Representative Danielson[3] concern the issue before us. They appear to describe the automatic operation of § 4205(a), not the authority granted sentencing judges under § 4205(b)(1). Inconclusive legislative history is insufficient to overcome the plain meaning of the statute. *See United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961).[4]

In *United States v. O'Driscoll,* 761 F.2d 589 (10th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986), the Court of Appeals for the Tenth Circuit held that under § 4205(b)(1) a sentencing court may prescribe a minimum period of incarceration in excess of ten years, so long as that minimum does not exceed one-third of the maximum sentence imposed: "[T]he Congress, in enacting § 4205(b)(1) specially allowed the trial courts to bypass the Parole Commission if the 'ends of justice and the best interests of the public' so require." *O'Driscoll,* 761 F.2d at 596. While no other court of appeals has directly reached the question, dictum from the Fifth Circuit suggests that a like result would obtain there:

**2.** 122 Cong.Rec. 4862 (1976).

**3.** 121 Cong.Rec. 15,703 (1975).

**4.** Judge Norris bases his dissent from this portion of our opinion on his interpretation of this legislative history. We prefer to follow the plain language of the statute rather than to attempt to discover from ambiguous legislative history what Congress meant but did not say. Our conclusion to do so is reinforced by the prior holding of the 10th Circuit in *United States v. O'Driscoll,* 761 F.2d 589 (10th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986). Gwaltney has not cited, nor have we found, any case from any circuit interpreting § 4205 in a manner inconsistent with the interpretation adopted by the 10th Circuit. Were we to adopt the interpretation urged by Gwaltney, we would create an intercircuit conflict. Unnecessary conflicts among the circuits are to be avoided. *See, e.g., United States v. Appoloney,* 761 F.2d 520, 523 (9th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985); *Lynch v. Rank,* 747 F.2d 528, 534

Another provision of the Act, § 4205(b), grants the district courts the discretion to determine, at the time of sentencing, when a prisoner imprisoned for more than a year shall become eligible for parole. Section 4205(b) permits the district courts to set that time at any point during the first third of the prison sentence. If the district court does not exercise that power, the prisoner will become eligible for parole, pursuant to § 4205(a), after service of one-third of his prison sentence.

*United States v. Pry,* 625 F.2d 689, 692 (5th Cir.1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1379, 67 L.Ed.2d 355 (1981). *See also United States v. Addonizio,* 442 U.S. 178, 189 n. 15, 99 S.Ct. 2235, 2242 n. 15, 60 L.Ed.2d 805 (1979) ("[t]he trial court may set a defendant's eligibility for parole at any point up to one-third of the maximum sentence imposed"); *United States v. Whitley,* 473 F.Supp. 23, 24 (E.D.Mich. 1979) (through the provisions of § 4205(b) "the sentencing judge, if he/she wishes, can bypass the one-third (⅓) or ten (10) year requirement of § 4205(a)").[5]

In light of the plain meaning of § 4205, its prior judicial interpretation, and the inconclusive nature of the legislative history, we hold that the trial court did not exceed its authority by providing that Gwaltney

(9th Cir.1984); *Director, Office of Workers' Compensation Programs v. Cargill, Inc.,* 709 F.2d 616, 619 (9th Cir.1983) (en banc); *Pinetree Transportation Co. v. NLRB,* 686 F.2d 740, 746 (9th Cir. 1982). Because of the plain language of the statute and the inconclusive legislative history, it would be inappropriate for us to create an intercircuit conflict in this case.

**5.** While the Court of Appeals for the Seventh Circuit has suggested, in dictum, that the apparent purpose of § 4205(b)(1) "is to allow release on parole before the earliest date allowed by subsection (a)" not "to postpone the date of eligibility for parole," *United States v. Fountain,* 768 F.2d 790, 799 (7th Cir.1985), that court supplemented its *Fountain* opinion in light of *O'Driscoll* to emphasize the narrowness of its holding and to make clear that it does not "take sides in what ... has become a controversy over the scope of section 4205(b)(1)." *United States v. Fountain,* 777 F.2d 345, 346 (7th Cir.1985).

must serve 30 years of his 90-year sentence before becoming eligible for parole.[6]

AFFIRMED.

NORRIS, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's judgment affirming Gwaltney's conviction. I disagree, however, with the majority's conclusion that the district judge had statutory authority to render Gwaltney ineligible for parole for a term of 30 years. I believe that 18 U.S.C. § 4205(a) reflects a clearly and firmly expressed Congressional mandate that, barring specific statutory exceptions, no federal prisoner · shall remain locked up for longer than ten years without receiving a parole hearing.

A common sense reading of the statutory language and the legislative history refutes the majority's interpretation of the statute. The language of section 4205(a) that "a prisoner shall be eligible for release on parole ... after serving ten years of a life sentence of over 30 years ...," [1] expresses a clear Congressional intent that prisoners shall become eligible for parole after serving at most ten years. In other words, section 4205(a) provides a maximum minimum sentence of ten years. The language of section 4205(b) expresses an equally clear Congressional intent to give sentencing judges the option of setting parole eligibility dates *earlier* than those prescribed in section 4205(a), but not later.[2] This does not mean, of course, that the prisoner has a right to be released when he becomes eligible for parole; it means only that he will be considered for release by the Parole Commission.

I recognize that any interpretation of section 4205(a) must account for the limiting phrase "except to the extent otherwise provided by law." The majority relies heavily on this "except" clause, reading into it a Congressional intent to refer to the very next subsection of the statute, 4205(b). In other words, the majority takes the position that in subsection (a) Congress mandated a ten-year limit on parole ineligibility, then turned around in subsection (b) and authorized individual judges to circumvent that limitation anytime they imposed a maximum sentence in excess of 30 years. Surely if Congress had intended to confer upon individual sentencing judges such unbridled discretion to disregard the command of section 4205(a), it would have said so explicitly. It strikes me as highly improbable that Congress, in using the unspe-

---

**6.** Under the terms of the sentence imposed, defendant will become eligible for parole upon serving 30 years of his 90-year term of incarceration. Accordingly, we need not address the effect, if any, of 18 U.S.C. § 4206(d) on a sentence purporting to require a convicted felon to serve more than 30 years prior to becoming eligible for parole.

**1.** Section 4205 provides in pertinent part as follows:

(a) Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over 30 years, except to the extent otherwise provided by law.

(b) Upon entering a judgment of conviction, the court having jurisdiction to impose a sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the

prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

**2.** This interpretation of the current parole eligibility provisions is hardly novel. *See* Federal Judicial Center, *The Sentencing Options of Federal District Judges* 3 (1983):

In the case of a life sentence or a sentence of more than thirty years, the prisoner is eligible after ten years. 18 U.S.C. section 4205(a). As this provision is interpreted by the Parole Commission, consecutive sentences do not delay eligibility beyond ten years. United States Parole Commission, Procedures Manual 121 (sec. M–01(a), (c)(1)) (Jan. 1986).

In the sentence, the judge may designate an *earlier* parole eligibility date or specify that the prisoner is immediately eligible. 18 U.S.C. sec. 4205(b)(1), (2). (Emphasis added).

cific language, "except as otherwise provided by law", intended to refer to the very next subsection of the statute. If that had been Congress' intent, I would expect to find in subsection (b) language such as "notwithstanding section 4205(a)."

I submit that the import of the language, "except as otherwise provided by law," is that Congress intended to refer to other statutes specifically precluding or restricting parole. For example, the exception phrase in section 4205(a) has been used to preclude parole for District of Columbia offenders when that federal jurisdiction had a *specific* statutory prohibition of parole eligibility for first degree murder. *Bryant v. Civiletti,* 663 F.2d 286, 292 (D.C. Cir.1981); *Frady v. U.S. Bureau of Prisons,* 570 F.2d 1027, 1029 (D.C.Cir.1978). Another example is 21 U.S.C. § 848(c), which explicitly prohibits parole for certain drug offenders. *See United States v. Valenzuela,* 646 F.2d 352, 254 (9th Cir.1980).

Moreover, the majority's expansive reading of the "except" clause produces a logical anomaly. Under the majority's interpretation, a prisoner sentenced to a term longer than 30 years for a civil rights violation may, as in Gwaltney's case, be required to serve a minimum sentence longer than ten years before becoming eligible for parole. Yet had Gwaltney been sentenced to a life term, he would automatically become eligible for parole after ten years. Section 4205(b)(1) empowers the sentencing judge to impose "a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court. . . ." Because it is impossible to know when a prisoner will have served one-third of a life term, subsection (b) obviously cannot apply to a life term. Thus had Gwaltney been convicted under the federal murder statute and not sentenced to death, he would have received a mandatory life term (18 U.S.C. § 1111(b) (1982); *United States v. Fountain,* 768 F.2d 790, 799, amended, 777 F.2d 345 (7th Cir.1985)), and would have been automatically eligible for parole after ten years. Yet the majority's

quirky reading of the statute allows his conviction under the civil rights statute to result in a 30-year wait for a parole hearing. There are other bizarre ramifications to the majority's reading of the statute. For example, while a first degree murderer who is not sentenced to death must be sentenced to a life term and become eligible for parole after ten years, a second degree murderer could be sentenced to a term greater than 30 years and be required to wait longer than ten years for a parole hearing. 18 U.S.C. § 1111(b) (1982).

The majority brushes off the legislative history of section 4205 as "inconclusive." *Supra* at 1388. To the contrary, the legislative history strongly supports my reading of the statute. The parole eligibility provisions in the Parole Commission and Reorganization Act of 1976 essentially recodified the scheme set forth in the Federal Sentencing Act of 1958. *See* S.Rep. No. 369, 94th Cong., 1st Sess., 22, *reprinted in* 1976 U.S.Code Cong. & Ad.News 335, 343: "The statutory basis for eligibility for parole for federal prisoners ... remains unchanged." Current section 4205(a) derives from former section 4202, which provided that a prisoner would be eligible for parole "after serving one-third of such term or terms or after serving fifteen years of a life sentence or of a sentence of over forty-five years." Act of June 25, 1948, ch. 645, 62 Stat. 854; July 13, 1951, ch. 277, 65 Stat. 150 (repealed 1976). Current section 4205(b) replicates former section 4208(a). Act of Aug. 25, 1958, 72 Stat. 845 (repealed 1976). Sections 4202 and 4208(a) under the 1958 Act were combined into current section 4205 by the 1976 Act.

The legislative history of the 1958 Act shows that Congress intended to provide for flexible parole options by authorizing sentencing judges to set a parole hearing date *earlier* than the lesser of one-third of the term or 15 years:

This is a bill to authorize the court in sentencing a prisoner *to fix an earlier date* when the prisoner shall become eligible for parole or to except such prison-

er from the statutory limitation as to eligibility for parole when in the judgment of the court it might reasonably be expected to facilitate the rehabilitation of the prisoner.

The additional flexibility in setting parole eligibility dates also received substantial support from Federal judges, according to Chairman Celler's survey. Through it judges would be given wider discretion in the formulation of sentences and could share the responsibility for determining the date of parole eligibility. This would provide judges with a choice which has some features of an indeterminate sentence which now is not available to Federal judges, except for those offenders committed under the Youth Corrections Act.

S.Rep. No. 2013, 85th Cong., 2d Sess. 2, *reprinted in* 1958 U.S.Code Cong. & Ad. News 3891, 3896–97 (emphasis added).

This same language was carried into the House Conference Report on the amendments made by the Senate concerning former section 4208, the predecessor of section 4205(b):

The purpose of the principal Senate amendment (sec. 3) is to provide the court with optional procedures which will enable it to impose sentences indeterminate in nature. *This will permit the court, at its discretion, to share with the executive branch responsibility* for determining how long a period a prisoner should actually serve. The court will be authorized to impose a term of imprisonment either under the existing definite sentencing system [in which a prisoner would be eligible for parole only after

serving one-third of his sentence], or fix the maximum term of the sentence and (1) direct that the prisoner shall be eligible for parole at any time up to one-third this maximum, as now provided by law, or (2) specify that the Board of Parole shall decide when the prisoner will be considered for parole. *In other words, if the court is so disposed, it may give the Parole Board greater latitude in a particular case or, if it is not so inclined, may follow the present sentencing system.*

Conference Report, Statement of the Managers on the part of the House on H.R.J. Res. 424, *reprinted in* 1958 U.S.Code Cong. & Ad.News 3891, 3905 (emphasis added).[3] Thus, Congress intended that a sentencing judge could increase the Parole Commission's latitude by advancing, not postponing, the parole eligibility date. Contrary to this intent, the majority's interpretation of the statute allows judges to reduce the Commission's latitude by postponing the statutory eligibility date.

In enacting the 1976 Act, Congress incorporated the sentencing alternatives of the 1958 Act, merely reducing the maximum possible parole ineligibility term from 15 to ten years. The ten-year limit on parole ineligibility seems to have been a clearly understood feature of the legislation. For example, Representative Danielson, a member of the House Judiciary Committee and one of the bill's floor managers, said:

I think one of the most important features is the section which provides that a prisoner has served a certain length of time, one-third of the sentence in the

---

**3.** In a letter to Senator James Eastland of the Senate Judiciary Committee on July 25, 1958, the Justice Department informed the Senator that section 4208 should be added to relieve the harshness of the parole eligibility standard in former section 4202:

The Department of Justice is of the view that the inclusion of section 4208, which was stricken from the House version, is highly desirable. The present statute, section 4202, title 18, United States Code, which provides that a prisoner is not eligible for parole consideration until he has served one-third of the sentence imposed, is purely arbitrary and

does not take into consideration the response made by an individual prisoner to the rehabilitation programs carried on in our Federal institutions. Much bitterness is engendered in many prisoners who have otherwise admirably responded to rehabilitation programs by the knowledge that they must be incarcerated for a purely arbitrary period as now provided by the Parole Act. The enactment of section 4208 would have the practical effect of authorizing the imposition of indeterminate sentences by Federal courts.
1958 U.S.Code Cong. and Ad.News 3891, 3904–05.

usual case, ten years in the case of an exceptionally long sentence, he shall be given a parole hearing. That does not mean that he will necessarily be released. 121 Cong.Rec. 15,703 (1975). Thus, the majority's interpretation of section 4205 not only derives no support from the legislative history, it is antithetical to Congress' intent as expressed in that legislative history.

Courts interpreting the parole eligibility scheme of the 1958 Act repeatedly observed that former section 4208 was intended strictly as an *early* parole option for sentencing judges. *See United States v. Price,* 474 F.2d 1223, 1228 (9th Cir.1973) (referring to former sections 4208 and 4209 as "early parole provisions"). As then Circuit Judge Blackmun stated in *United States v. Jones,* 419 F.2d 593, 595 (8th Cir.1969): "Section 4208(a)(1) [now 4205(b)(1) ] ... authorizes the sentencing court to set an *earlier* time for parole eligibility than would otherwise be the case under the one-third-of-the-term measure established by section 4202 [now 4205(a) ]." (Emphasis added). Moreover, in *United States v. Addonizio,* 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), the Supreme Court recognized that in both the 1976 Act and the 1958 Act, Congress allowed judges to accelerate parole eligibility, while placing the ultimate power of release with the parole authority:

> The decision as to when a lawfully sentenced defendant shall actually be released has been committed by Congress, with certain limitations, to the discretion of the Parole Commission. Whether wisely or not, Congress has decided that the Commission is in the best position to determine when release is appropriate, and in doing so, to moderate the disparities in the sentencing practices of individual judges. *The authority of sentencing judges to select precise release dates is, by contrast, narrowly limited: the judge may select an early parole eligibility date, but that guarantees only that the defendant will be considered at that time by the Parole Commission.*

442 U.S. at 188–89 (footnotes omitted) (emphasis added).

The majority seems oblivious to the system of checks and balances that Congress built into the parole process. Though the judiciary is responsible for imposing sentences, the executive branch—through the Parole Commission—takes a second look at a prisoner and makes the "final determination of precisely how much time an offender must serve...." S.Rep. No. 369, 94th Cong., 1st Sess. 16, *reprinted in* 1976 U.S. Code Cong. & Ad.News 335, 337. The Parole Commission must weigh a number of complex factors in making its decision, not the least of which is "the likelihood that an offender will refrain from future acts." *Id.* The Parole Commission's exercise of hindsight is necessary because, at the time of sentencing, a judge cannot lay claim to complete prescience. Thus, "parole provides a means of releasing those inmates who are ready to be responsible citizens, and when continued incarceration, in terms of the needs of law enforcement, represents a misapplication of tax dollars." S.Rep. No. 369, 94th Cong., 1st Sess. 16, *reprinted in* 1976 U.S.Code Cong. & Ad. News 335, 338. Of equal importance, the Parole Commission is engaged in "balancing differences in sentencing policies and practices between judges and courts in a system that is as wide and diverse as the Federal criminal justice system." S.Rep. No. 369, 94th Cong., 1st Sess. 16, *reprinted in* 1976 U.S.Code Cong. & Ad.News 335, 337. Congress patently intended to reduce the wide variations in sentencing that will inevitably result from the exercise of discretion by hundreds of individualistic federal district judges.

The instant case illustrates the point. At the sentencing hearing Judge Rymer stated:

> As I see it, therefore, the sentencing choice is either a life sentence under 4205(a), in which case the defendant would be eligible for parole in 10 years and the decision about how long he should serve would be vested in the Parole Commission 10 years from now, or a

sentence of a specified maximum and minimum term of years under 4105(b)(1), in which case it is up to me to designate at this time how long the defendant shall serve. I believe that it is incumbent upon me to make that decision in this case. Normally it is appropriate to sentence flexibly, leaving discretion to the Parole Commission, because release from prison is in part a function of how the prisoner progresses. However, in the case of Mr. Gwaltney, rehabilitation is not a factor. Moreover, there is no reason to suspect that in prison he will not behave in a proper fashion. There is thus, in my view, nothing to be anticipated over the course of the next 10 years which could inform the Parole Commission's discretion other than what is now known to me.

Reporter's Transcript at 4051–52. Thus Judge Rymer interpreted section 4205(b)(1) as vesting in her the authority to by-pass the ten-year limitation of section 4205(a) by imposing a maximum sentence of 90 years and requiring Gwaltney to serve a minimum term of 30 years. I do not question Judge Rymer's considered judgment that Gwaltney is unsuitable for parole. What I do question is her interpretation of the statute. I believe that Congress intended that the Parole Commission would review Gwaltney's suitability for parole after he serves ten years in prison. To empower sentencing judges to warehouse prisoners for 30 years or longer without possibility of parole is to empower them to render the Parole Commission impotent to play its statutory role of "balancing differences in sentencing policies and practices." *See* page 1385, *supra.*

Instead of following Congress' intent, the majority follows *United States v. O'Driscoll,* 761 F.2d 589 (10th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1207, 89 L.Ed.2d 320 (1986). In that case, the Tenth Circuit decided that section 4205(b)(1) allows a sentencing judge to ignore section 4205(a) and "bypass the Parole Commission if the 'ends of justice and the best interest of the public' so require." 761 F.2d at 596. Ironically, the piece of legislative history primarily relied upon by the Tenth Circuit is the phrase from the 1958 Senate Report concerning "the sharing of power" by the sentencing judge and the executive branch. *Id.* The sentence in *O'Driscoll* —300 years, with parole eligibility after 99 years—is inimical to such "sharing" because it nullified the role of the Parole Commission in that case.[4] In my view, the Tenth Circuit did not interpret section 4205; it amended it.

At most, section 4205 is ambiguous, which would bring into play the rule of lenity. That rule provides that courts will not resolve ambiguities in statutes in favor of increasing criminal penalties absent clear support for such an interpretation in the legislative history. *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). But I do not believe that there is any need to invoke the rule of lenity in this case because the legislative history of section 4205 and its antecedents manifests a clear Congressional intent to provide sentencing judges with the option of fixing an early parole eligibility date, not to postpone that date beyond the statutory limit.

The interpretation of section 4205 espoused by the majority here, and by the Tenth Circuit in *O'Driscoll,* eviscerates the Congressional scheme of shared authority in making parole decisions. Apparently, the majority misperceives what is at stake in this case. Parole eligibility does not equal release, and views expressed by sentencing judges are given consideration and respect by the Parole Commission. *Williams v. U.S. Parole Commission,* 707 F.2d 1060, 1065 (9th Cir.1983). The judiciary should afford similar respect to the role of the

---

**4.** There is no question that the crime in *O'Driscoll* was particularly heinous and merited strict punishment. There is every reason to believe that, even had the Tenth Circuit correctly interpreted section 4205 to provide for parole eligibility after ten years, the defendant would not actually have been paroled until long after that point, if ever. *O'Driscoll* shows that sometimes easy cases make bad law.

Parole Commission as envisioned by Congress.

I would vacate Gwaltney's sentence and remand the case to the district court for resentencing.